# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CAMEROON WHITERU, *Individually and as Personal Representative of the Estate of Okiemute C. Whiteru, ex ux.*, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 15-cv-0844 (KBJ) |
| WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, | ) ) ) ) | |
| Defendant. | ) ) ) | |

## <u>MEMORANDUM OPINION</u>

This case concerns the death of Okiemute Whiteru ("Whiteru"), whose body was discovered in the Judiciary Square Metro Station on October 23, 2013. Whiteru suffered an accidental injury inside the Metro Station on October 19, 2013; in the instant lawsuit, Whiteru's parents, Cameroon Whiteru and Agnes Whiteru (collectively, "Plaintiffs"), contend that the Washington Metropolitan Area Transit Authority ("WMATA") negligently failed to discover Whiteru in time to provide him with life-saving emergency medical assistance. Plaintiffs' negligence claim arises under the common law of the District of Columbia (*see* Am. Compl., ECF No. 21, ¶¶ 23–30 (Count I)), and based on the alleged negligence, Plaintiffs have also brought a survival action under D.C. Code § 12-101 (*see id.* ¶¶ 31–34 (Count II)), and a claim for wrongful death pursuant to D.C. Code § 16-2701 (*see id.* ¶¶ 35–36 (Count III)).

Before this Court at present is WMATA's motion for summary judgment under Federal Rule of Civil Procedure 56. (*See* Def.'s Mot. for Summ. J. ("Def.'s Mot."),

ECF No. 27, at 8.)[1]  In support of its motion, WMATA argues that the doctrine of sovereign immunity bars Plaintiffs' tort claims (*see id.*), or alternatively, that WMATA is entitled to judgment as a matter of law because Plaintiffs have failed to present evidence that is sufficient to establish all of the essential elements of their tort claims (*see id.*).  Plaintiffs oppose WMATA's summary judgment motion on the grounds that WMATA has waived its sovereign immunity for the conduct alleged, and that there are genuine disputes about material facts that pertain to each of the elements of Plaintiffs' negligence accusation.  (*See* Pls.' Mem. in Opp'n to Def.'s Mot. for Summ. J. ("Pls.' Opp'n"), ECF No. 28, at 10–15.)

For the reasons explained fully below, this Court finds that WMATA is not entitled to sovereign immunity for the conduct alleged, and that Plaintiffs have satisfied their burden of bringing forward admissible evidence that could support a reasonable jury finding that WMATA breached a duty of care that it owed to Whiteru and thereby caused his death.  As a result, WMATA's motion for summary judgment will be **DENIED**, and this case will be scheduled for trial.  A separate Order consistent with this Memorandum Opinion will follow.

## I.  BACKGROUND

### A.  Facts Pertaining To Whiteru's Death[2]

Okiemute Whiteru was a 35-year-old attorney who lived and worked in Washington, D.C.  (*See* Pls.' Resp. to Def.'s Statement of Material Facts ("Pls.'

---

[1] Page-number citations to documents the parties have filed refer to the page numbers that the Court's electronic filing system assigns.

[2] The facts recited here are primarily drawn from the parties' statements of fact, which are based on WMATA surveillance video and depositions from WMATA station managers, among other record evidence.  Unless otherwise noted, these facts are undisputed.  *See* Fed. R. Civ. P. 56(a).

Material Facts"), ECF No. 30, at 3.)  Shortly after midnight on Saturday, October 19, 2013, Whiteru rode a D.C. Metro train from the Farragut North Station to the Judiciary Square Station.  (*See id*. at 3–4.)  After Whiteru exited the train, he rode the escalator from the platform up to the mezzanine level of the station.  (*See id.* at 4.)[3]

At around 1:07 a.m., Whiteru approached the information kiosk on the mezzanine level of the Judiciary Square station and spoke to Rhonda Brown, the station manager on duty.  (*See id.*; Aff. of William C. Martin, Ex. 1 to Def.'s Reply to Pls.' Resp. to Def.'s Statement of Material Facts, ECF No. 31-1, at 3.)  Brown helped Whiteru pass through the turnstile, and Whiteru proceeded down the escalator to the platform for Shady Grove-bound trains.  (*See* Pls.' Material Facts at 4; Def.'s Mot. at 6.)  At the time, the escalator down to the platform was stationary, *i.e.*, it was in "stair mode."  (Pls.' Material Facts at 4.)

Whiteru stumbled down the last few steps of the escalator and fell onto the train platform.  (*See* Def.'s Mot. at 6.)  No one else was on the platform, and Whiteru lay at the base of the escalator for over three and a half minutes before he struggled to his feet.  (*See* Pls.' Material Facts at 5.)  After he stood up, Whiteru leaned against the three-foot concrete parapet—a protective wall—that runs along the outside edge of the platform, on the opposite side of where the trains arrive.  (*See id.*)  There is a 53-inch gap between the edge of the platform where the parapet is and the station wall (*see*

---

[3] Whether Whiteru left the Judiciary Square Metro Station before he ultimately returned to the train platform is disputed.  (*Compare* Pls.' Material Facts at 4, *with* Def.'s Reply to Pls.' Material Facts ("Def.'s Reply re: Material Facts"), ECF No. 31, at 3.)  However, there is no dispute that Whiteru exited the "paid area" of the Metro Station at 12:48 a.m., just under 20 minutes before he approached the kiosk.  (Aff. Of William Martin, Ex. 1 to Def.'s Reply re: Material Facts, ECF No. 31-1, at 2.)

Investigative Report of Brian L. Mills, Ex. 7 to Pls.' Opp'n, ECF No. 28-7, at 14); the parapet separates the train platform from that gap (*see id.* 14–15).[4]

After approximately 45 seconds of leaning, Whiteru tried to sit on top of the parapet.  (*See* Def.'s Mot. at 5–6.)  Less than ten seconds later, at approximately 1:15 a.m., Whiteru fell backwards, over the top of the parapet and into the gap between the platform and the station wall.  (*See id.* at 7; Pls.' Material Facts at 5; *see* Def.'s Reply to Pls.' Resp. to Def.'s Statement of Material Facts ("Def.'s Reply re: Material Facts"), ECF No. 31, at 5.)  As a result of this fall, Whiteru suffered severe injuries, including a fracture of his "bony vertebrae at the C-5 level" (*see* Pls.' Material Facts at 5), but he did not die instantly (*see id.* at 13).  The parties dispute exactly how long Whiteru was still alive after the fall, but they agree that Whiteru would have survived this accident if he had been discovered by 1:30 a.m.—*i.e.*, 15 minutes after he fell.  (*See id.*; Def.'s Reply re: Material Facts at 16.)  Moreover, there is no dispute that if Whiteru had been discovered soon after his accident and had received medical care, he would have survived this accident without any traumatic brain injury.  (*See* Pls.' Material Facts at 13–14.)  However, Whiteru was not immediately discovered; he remained behind the parapet wall for more than four and a half days (*see id.* at 5–6), and had already died from his injuries by the time he was found (*see id.* at 6).

Four days after Whiteru's fall—on October 23, 2013, at approximately 2:50 p.m.—an anonymous Metro passenger told Metro employee Reginald Herron, who was the station manager on duty at the mezzanine-level kiosk at that time, that he saw a

---

[4] The station's foundation is behind the parapet; the foundation is more than three feet below the passenger platform and more than seven feet below the top of the parapet.  (*See id.* at 17–18.)

human body behind the parapet. (*See id.* at 6.)[5]  Rhonda Brown, who happened to be on duty that day, went with Herron to the area of the platform where the passenger had seen the body. (*See id.* at 12; Herron Dep., Ex. 3 to Pls.' Opp'n, ECF No. 28-3, at 2−3.) Looking over the parapet, Brown was able to see Whiteru's body in the space between the platform and the station wall without a flashlight or any other equipment. (*See* Pls.' Material Facts at 12−13.)

Notably, as the station manager on duty when Whiteru entered the station on October 19, 2013, Rhonda Brown was supposed to inspect the station platform three times after Whiteru's fall—at 1:30 a.m., 2:30 a.m., and when the station closed that night, at 3:15 a.m. (*See id.* at 10−11.)  Brown signed the station manager checklist indicating that she had completed these inspections (*see* Station Manager Hourly Checklist, Ex. to Def.'s Mot, ECF No. 27-3, at 2), but had no independent memory of them after Whiteru's body was discovered (*see* Pls.' Material Facts at 10).[6]

## B.    Facts Pertaining To WMATA's Standard Operating Procedures[7]

WMATA maintains a manual of standard station operating procedures ("SSOPs") that pertain to the agency's mission, which is "to move customers through the Metrorail

---

[5] Herron did not take any of the passenger's information at the time, and the passenger got on a train and left the station after showing Herron where he saw the body. (*See* Pls.' Material Facts at 6; Herron Dep., Ex. 3(a) to Pls.' Opp'n, ECF No. 28-3, at 2−3.)

[6] There is no available surveillance footage of the station after 1:15 a.m. on October 19, 2013, and thus, no video evidence has been submitted that shows Brown completing the inspections. (*Compare* Pls.' Material Facts at 11 (claiming as an undisputed fact that there is "no surveillance video evidence" of Brown's three inspections), *with* Def.'s Reply re: Material Facts at 13−14 (disputing the contention that no such evidence exists, but stating that "[t]here is no video imaging that was retrieved after Mr. Whiteru's fall over the concrete wall").)

[7] Like the facts related above, the facts pertaining to WMATA's standard operating procedures are also undisputed, unless otherwise noted.  These facts are relevant to WMATA's sovereign immunity argument as well as its argument that Plaintiffs have failed to present evidence sufficient to establish WMATA's negligence.

system in an efficient, effective and safe manner." (SSOP, Ex. 4 to Pls.' Opp'n, ECF No. 28-4, at 1.) WMATA station managers must be familiar with and comply with the policies; they must also ensure the procedures are executed properly. (*See id.* at 7.)

SSOP 46.5.4 lays out the procedures that station managers are supposed to use when closing Metro stations. As relevant here, SSOP 46.5.4.12 mandates a "visual inspection" of the station "to ensure that no customers are in the station." (*Id.* at 10.) In its entirety, this SSOP states:

> Closing Station Managers shall make a visual inspection of the mezzanine and platform area of the station, *which includes walking the station platform from end gate to end gate*, to ensure that no customers are in the station. Pay special attention to areas of the station where confused customers or customers with diminished capacity might sleep.

*Id.* at 10–11 (emphasis added).[8] Notably, the directive that a closing station manager's visual inspection "includes walking the station platform from end gate to end gate" was added to the SSOP in September 2010. (*Compare* Pls.' Material Facts at 7 (current version of the SSOP), *with id.* 7–8 (version in effect prior to September 2010).) Thus, at the time of Whiteru's accident, station managers were required to inspect the platform by walking the area *in person*, even though the mezzanine-level kiosks that station managers sit in are equipped with closed-circuit monitors of the platform area. Moreover, by the date at issue, WMATA had specifically instructed its managers to "[p]ay special attention to areas of the station where intoxicated customers or customers with diminished capacity might sleep[,]" in contrast to the prior directive, which had used more passive language

---

[8] This procedure also applies to the hourly inspections that station managers are required to make. (*See* Pls.' Material Facts 6–7.)

concerning a closing manager's obligations in this regard.  (*Compare id.* at 7

(current version of the SSOP), *with id.* at 7−8 (version in effect before September

2010, which stated that "[s]pecial attention should be given" to such areas).)

As a station manager on the night of Whiteru's accident, Rhonda Brown was

familiar with the prior version of this SSOP, and was also aware of her obligations

under the version of the SSOP then in effect.  (*See id.* at 9−10.)

### C.    Procedural History

Plaintiffs filed suit against WMATA in Superior Court on May 1, 2015.  (*See*

Compl., Ex. 1 to Def.'s Notice of Removal, ECF No. 1-1.)  The original complaint

asserted (1) a claim for premises liability, (2) a claim for negligence, (3) a survival

action pursuant to D.C. Code § 12-101, and (4) a claim for wrongful death pursuant to

D.C. Code § 16-2701.  (*See id.* at 13−19.)  WMATA removed the action to federal court

on June 8, 2015, pursuant to D.C. Code Ann. § 9-1107.01(81).  (*See* Def.'s Notice of

Removal, ECF No. 1, at 1−2.)

On June 15, 2015, WMATA filed a motion to dismiss Plaintiffs' lawsuit for

failure to state a claim upon which relief could be granted under Federal Rule of Civil

Procedure 12(b)(6).  (*See* Def.'s Mot. to Dismiss, ECF No. 5, at 1.)  WMATA argued

that sovereign immunity barred Plaintiffs' premises liability claim, and that Plaintiffs'

complaint failed to state a claim for negligence because it did not identify the relevant

duty of care.  (*See id.* at 5−8.)  In their opposition brief, Plaintiffs maintained that

sovereign immunity did not bar their premises liability claim because this claim was

based on WMATA's "negligent implementation of policy decisions[,]" and also, that

WMATA owed a duty of reasonable care to its passengers.  (Pls.' Opp'n to Def.'s Mot. to Dismiss, ECF No. 8, at 3.)

This Court held a hearing on WMATA's motion on November 4, 2015, and it ultimately granted the motion to dismiss in part, and denied it in part, for several reasons.  (*See* Order of Nov. 4, 2015, ECF No. 13.)[9]  WMATA answered the three remaining counts of the complaint on November 12, 2015 (*see* Answer, ECF No. 14), and with WMATA's consent, Plaintiffs filed an amended complaint on January 7, 2016 (*see* Am. Compl.).  WMATA filed its answer to the amended complaint on the same day (*see* Answer, ECF No. 22), and the parties proceeded to the discovery phase of the litigation.

On July 19, 2016, WMATA filed the instant motion for summary judgment, arguing that it is entitled to summary judgment on the basis of its sovereign immunity with respect of each of Plaintiffs' remaining claims, and that, in any event, Plaintiffs have failed to adduce sufficient evidence to support all the essential elements of their negligence-based claim.  (*See* Def.'s Mot. at 1.)  Plaintiffs filed a brief in opposition to WMATA's motion on August 18, 2016 (*see* Pls.' Opp'n), and WMATA filed a reply on September 1, 2016 (*see* Def.'s Reply to Pls.' Opp'n ("Def.'s Reply"), ECF No. 29).  WMATA's summary judgment motion became fully ripe on February 15, 2017, after a

---

[9] Specifically, the Court concluded Plaintiffs had failed to state a claim for premises liability, regardless of how the Court interpreted this claim, and dismissed that aspect of Plaintiffs' complaint. (*See* Nov. 4, 2015 Hr'g Tr.)  The Court further explained that, to the extent Plaintiffs intended to raise a negligent design claim, sovereign immunity shielded WMATA from any challenge to the design of the metro station.  (*See id.*)  But the Court also concluded that Plaintiffs' complaint contained sufficient allegations of fact to state a claim for negligence, and in addition, that Plaintiffs' "survival action" and "wrongful death action" counts could survive as procedural vehicles related to the negligence claim. (*See id.*)  The Court treated WMATA's motion solely as a motion to dismiss, and in denying the motion, it expressly declined WMATA's request that its motion to dismiss be converted to one for summary judgment.  (*See* Order of Nov. 4, 2015, ECF No. 13, at 2.)

series of court-ordered filings related to the parties' statements of material facts. (*See* Min. Order of Feb. 1, 2017 (ordering Plaintiffs to respond to WMATA's Statement of Material Facts); Pls.' Material Facts, ECF No. 30; Def.'s Reply re: Material Facts, ECF No. 31.)

## II. LEGAL STANDARDS

### A. Motions To Dismiss For Lack Of Subject-Matter Jurisdiction

WMATA's claim of sovereign immunity is, in effect, an argument that this Court lacks subject-matter jurisdiction over Plaintiffs' claims in this case. *See Smith v. WMATA*, 290 F.3d 201, 205 (4th Cir. 2002) ("To the extent [WMATA's] complained-of actions fall within its cloak of immunity, we lack subject matter jurisdiction over such claims."); *Burkhart v. WMATA*, 112 F.3d 1207, 1216 (D.C. Cir. 1997) (noting that "sovereign immunity claims are jurisdictional"). Consequently, this Court will construe WMATA's summary judgment motion as one that partly seeks dismissal for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). (*See* Def.'s Mot. at 10–17.) *See also Smith*, 290 F.3d 201, 205 ("[A]n assertion of governmental immunity is properly addressed under the provisions of Rule 12(b)(1) of the Federal Rules of Civil Procedure.").

When a defendant has filed a Rule 12(b)(1) motion to dismiss the complaint for lack of subject-matter jurisdiction, the plaintiff bears the burden of establishing, by a preponderance of the evidence, that the court has jurisdiction. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). To resolve jurisdictional questions, the court may look beyond the allegations of the complaint, *see Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987); however, unlike a

motion for summary judgment, a motion to dismiss for lack of subject-matter jurisdiction need not be decided solely on the basis of undisputed facts. *See* Fed. R. Civ. P. 56(a). Instead, with reference to evidence from beyond the pleadings, the court may "resolve factual disputes concerning jurisdiction." *Smith*, 290 F.3d at 205 (quoting *Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995)).

### B. Motion For Summary Judgment

To evaluate WMATA's claim that Whiteru has failed to "establish a . . . duty of care and failed to demonstrate a violation of a standard of care" (*see* Def.'s Mot. at 8), the Rule 56 summary judgment standard is appropriate. To support a motion for summary judgment, the moving party must demonstrate that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the non[-]moving party.'" *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Summary judgment should be granted against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Initially, the moving party must demonstrate that there is no genuine dispute as to any material fact. *See id.* at 323. Once the party seeking summary judgment has met that burden, the non-moving party must designate "specific facts showing that there is a

genuine issue for trial" to defeat the motion. *Id.* at 324 (internal quotation marks and citation omitted). Under Rule 56,

> [a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

Although this Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor, *see Grosdidier v. Broad. Bd. of Governors, Chairman*, 709 F.3d 19, 23–24 (D.C. Cir. 2013), the non-moving party must show more than "[t]he mere existence of a scintilla of evidence" to raise a triable issue of fact for the jury, *Anderson*, 477 U.S. at 252. Instead, "there must be evidence on which the jury could reasonably find" for the non-moving party. *Id*. Thus, the non-moving party "may not rest upon mere allegation or denials of his pleading[s] but must present affirmative evidence showing a genuine issue for trial." *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (internal quotation marks and citation omitted); *see Ass'n of Flight Attendants–CWA, AFL–CIO v. U.S. Dep't of Transp.*, 564 F.3d 462, 465–66 (D.C. Cir. 2009) (conclusory assertions without support from record evidence cannot create a genuine dispute).

This Court is mindful that, in deciding a summary judgment motion, it is not a court's role to "determine the truth of the matter, but instead [to] decide only whether

there is a genuine dispute for trial." *Lawrence v. Lew*, 156 F. Supp. 3d 149, 160

(D.D.C. 2016) (alteration in original) (internal quotation marks and citation omitted).

Indeed, "[c]redibility determinations, the weighing of the evidence, and the drawing of

legitimate inferences from the facts are jury functions, not those of a judge at summary

judgment." *Barnett v. PA Consulting Grp., Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013)

(internal quotation marks and citation omitted).

## III. ANALYSIS

WMATA first argues that sovereign immunity shields it from suit, and liability,

for Whiteru's unfortunate death.  In the alternative, WMATA argues that Plaintiffs have

failed to satisfy their burden of producing admissible evidence that would raise any

genuine issue of material fact with respect to the existence of essential elements of

Plaintiffs' negligence claim.  For the reasons explained below, neither of WMATA's

summary-judgment arguments succeeds.

### A. WMATA Is Not Immune From Suit Under The Circumstances Presented In This Case

#### 1. WMATA Does Not Enjoy Sovereign Immunity With Respect To Torts That Occur In The Course Of Its Proprietary Functions

Maryland, Virginia, and the District of Columbia created WMATA in order to

provide a regional transportation system to the Washington, D.C. metropolitan area.

*See Delon Hampton & Assocs., Chartered v. WMATA*, 943 F.2d 355, 357 (4th Cir.

1991).  The three governments formed the agency pursuant to a "compact[,]" *see* D.C.

Code Ann. § 9-1107.01, and in so doing, the states expressly conferred upon WMATA

their own Eleventh Amendment sovereign immunity, *see Watters v. WMATA*, 295 F.3d

36, 39 (D.C. Cir. 2002) (explaining that, "[a]s we have repeatedly held, the three

signatories conferred each of their respective sovereign immunities, including the

Eleventh Amendment immunity of the two states, upon the Authority" (citations omitted)); *see also* U.S. Const. amend. XI. "Thus, unless WMATA's sovereign immunity has been waived, [a] district court lacks jurisdiction to enter a judgment against" it. *Watters*, 295 F.3d at 39–40 (citing *Burkhart*, 112 F.3d at 1216).

Notably, Section 80 of the WMATA Compact waives WMATA's sovereign immunity under certain circumstances; specifically, that statute states that WMATA

> shall be liable for its contracts and *for its torts* and those of its Directors, officers, employees and agents *committed in the conduct of any proprietary function*, in accordance with the law of the applicable signatory (including rules on conflict of laws), but shall not be liable for any torts occurring in the performance of a governmental function.

D.C. Code Ann. § 9-1107.01(80) (emphasis added). Thus, the question of whether WMATA enjoys sovereign immunity from tort liability in any given case turns on whether the alleged tort was committed in the course of "any proprietary function," as opposed to "a governmental function." *Id.*

The path that a court must take in order to determine whether an alleged tort of WMATA's was committed in the course of a governmental function (for which the agency enjoys sovereign immunity) or a proprietary function (with respect to which sovereign immunity is waived) is well worn. Courts first ask whether the "challenged conduct 'amounts to a "quintessential" government function, like law enforcement.'" *Tapp v. WMATA*, No. 15-cv-768, 2016 WL 7441719, at *8 (D.D.C. Sept. 16, 2016) (citing *Beebe v. WMATA*, 129 F.3d 1283, 1287 (D.C. Cir. 1997)). If the conduct is quintessentially governmental, the court's inquiry ends there, because WMATA is unquestionably entitled to immunity from suit. *See id.* However, in many cases, the

complained-of conduct is *not* quintessentially governmental, so the court must venture further in order to determine whether a lawsuit against WMATA can proceed. *See id.*

To further parse WMATA's immunity, courts have imported the distinction between "discretionary" and "ministerial" acts from the Federal Tort Claims Act ("FTCA"), because the line between governmental and proprietary functions can be difficult to ascertain. *See KiSKA Constr. Corp. v. WMATA*, 321 F.3d 1151, 1158 (D.C. Cir. 2003); *see also Smith*, 290 F.3d at 207 ("The Supreme Court long ago characterized the FTCA as distinguishing between 'acts of a governmental nature or function,' which remain immune, and ministerial functions resulting in 'ordinary common-law torts,' as to which the FTCA has waived governmental immunity." (quoting *Dalehite v. United States*, 346 U.S. 15, 28 (1953))). To be sure, the FTCA's "discretionary" functions and Section 80's "governmental" functions are not coterminous, nor can it necessarily be said that all "proprietary" functions for the purpose of Section 80 must be "ministerial" as FTCA jurisprudence defines that term. But it is well established that "discretionary" acts are "at least a subset of 'governmental functions.'" *Sanders v. WMATA*, 819 F.2d 1151, 1155 n.9 (D.C. Cir. 1987). Thus, a "discretionary" act within the meaning of the FTCA is properly considered to be part of an agency's "governmental function," and therefore, courts have concluded that WMATA has retained sovereign immunity with respect to torts resulting from discretionary acts. *See, e.g.*, *Beebe*, 129 F.3d at 1288; *Burkhart*, 112 F.3d at 1217. Conversely, "[u]nder [the FTCA] framework, when the agency commits a ministerial act, it is engaging in a proprietary function" for Section 80 purposes. *Tapp*, 2016 WL 7441719, at *8.

14

Under step one of the governmental-versus-proprietary-act inquiry, courts ask whether "any statute, regulation, or policy specifically prescribes a course of conduct for an employee to follow." *KiSKA*, 321 F.3d at 1159 (internal quotation marks and citation omitted). If such authority exists, *and* if the relevant statute, regulation or policy *leaves no room for discretion* regarding the agency's conduct, then the alleged tort resulted from the exercise of a proprietary function, and WMATA cannot claim sovereign immunity protection. *See id.* But if there is no such statute, regulation, or policy—or if the relevant guidance leaves room for discretion—courts proceed to step two of the inquiry, which requires an evaluation of the extent of the agency's "exercise of discretion and the limits (if any) on [its] decision-making[.]" *Tapp*, 2016 WL 7441719, at *8. This evaluation involves asking "whether the [agency's] exercise of discretion is grounded in social, economic, or political goals[,]" and if so, "the activity is governmental," and "fall[s] within section 80's retention of sovereign immunity[.]" *KiSKA*, 321 F.3d at 1159 (internal quotation marks and citations omitted).

Thus, the non-existence of a policy that governs a particular agency function, or the existence of some amount of discretion within the policy, does not necessarily mean that WMATA enjoys sovereign immunity. Moreover, while WMATA and its employees need not actually engage in a policy judgment when carrying out the conduct at issue, the exercise of discretion that warrants immunity still must be a "decision . . . which we would expect inherently to be grounded in considerations of policy." *Smith*, 290 F.3d at 208 (internal quotation marks and citation omitted). That is, if the agency (or its employee) exercises discretion in a manner that involves such policy considerations, WMATA is immune from suit. *See Tapp*, 2016 WL 7441719, at *8 (citing *Beebe*, 129

15

F.3d at 1287).  If it does not, then the act fits within WMATA's waiver of sovereign immunity, and the lawsuit may proceed.  *See id.* (citing *KiSKA*, 321 F.3d at 1158).

2. <u>Because Whiteru's Injuries Allegedly Resulted From Agency Employees' Failure To Follow WMATA's Non-Discretionary Closing Procedures For Metro Stations, WMATA Cannot Claim Sovereign-Immunity Protection</u>

Here, WMATA does not argue that the conduct at issue is part of a quintessential governmental function, but it maintains nevertheless that WMATA retains sovereign immunity with respect to the challenged conduct—i.e., the station manager's failure to conduct a reasonable inspection of the train platform—because (1) Plaintiffs have failed to identify "any statute, regulation or policy applicable to the maintenance of mass transit rail stations[,]" and (2) closing procedures for Metro Stations involve discretionary policy considerations by station managers.  (Def.'s Mot. at 17.)  Plaintiffs respond that WMATA's SSOPs govern a station manager's inspections of the train platform and the prescribed duties are not discretionary.  (*See* Pls.' Opp'n at 14.)  Therefore, in Plaintiffs view, this lawsuit fits within Section 80's express waiver of sovereign immunity.  (*See id.*)  This Court agrees with Plaintiffs.

WMATA's first argument—that there is no statute, regulation, or policy on point—is clearly unavailing.  Plaintiffs point to the agency's Standard Operating Procedures, and SSOP 46.5.4.12 in particular, as the relevant WMATA policy, because that written policy concerns station managers' inspections of station platforms before closing and requires hourly walk-through inspections of the platforms.  (*See* Pls.' Material Facts at 6−7.)  It is undisputed that SSOP 46.5.4.12 exists to "reduc[e] the likelihood of customers being locked into metrorail stations after they are closed[,]" and this policy prescription specifically refers to "confused customers" and "customers with

16

diminished capacity." (*Id.* at 7–8.) Whiteru was a customer whose capacity was diminished, and this was especially so after he fell behind the parapet. Moreover, there is no question that he was locked in the Judiciary Square Metro Station after it closed on October 19, 2013—and for three nights thereafter. Thus, this Court easily finds that SSOP 46.5.4.12, which is a "policy [that] specifically prescribes a course of conduct for an employee to follow" regarding closing inspections, is relevant to Plaintiffs' negligence allegations. *KiSKA*, 321 F.3d at 1159 (internal quotation marks and citation omitted); *see also, e.g.*, *Walen v. United States*, No. 15-1718, 2017 WL 1207412, at *7 (D.D.C. Mar. 31, 2017) (concluding that, pursuant to an established Tree Management Action Plan, the agency was "mandated to conduct monthly inspections of trees on a primary road [and] bi-annual inspection of trees that pose a risk to the public, and [to] comply with specific industry standards for tree care[,]" and that "[t]hese clear mandates remove[d] the immunity shield provided by the discretionary function exception in the FTCA").

Having concluded that there is a WMATA policy that prescribes relevant conduct for WMATA employees concerning platform inspections, the remaining question for the purpose of analyzing WMATA's sovereign immunity in the instant case is whether SSOP 46.5.4.12 leaves room for discretion, and if so, whether the exercise of a station manager's discretion is grounded in social, economic, or policy goals. Notably, SSOP 46.5.4.12 lays out a *specific* course of conduct for station managers inspecting the station platform each hour and at closing time: under the policy, station managers must "make a visual inspection of the mezzanine and platform area of the station, which includes walking the station platform from end gate to end gate," and they must also

"[p]ay special attention to areas of the station where confused customers or customers with diminished capacity might sleep." (SSOP at 10–11.) Certainly with respect to the *manner* in which a station manager must conduct a "visual inspection"—by walking the platform from end to end, not just by checking closed-circuit monitors—the policy leaves no room for discretion, as the 2010 amendments to the relevant SSOP make clear. (*Compare* Pls.' Material Facts at 7 (current version of the SSOP), *with id.* at 7–8 (version in effect before September 2010, which did not contain an explicit requirement that station managers perform in-person inspections of the platform).)

What is more, the amended SSOP replaced the passive statement "[s]pecial attention should be paid" to areas where customers might sleep with the imperative "*[p]ay special attention*" to those areas. (*Id.* (emphasis added)). The word "should" as it previously appeared in the prior version of the inspection policy could conceivably have conferred discretion on station managers regarding whether such attention is always required. *Cf. WMATA v. Barksdale-Showell*, 965 A.2d 16, 23 (D.C. 2009) (remarking that a certain SSOP "contains an element of discretion" because it has the term "if possible" in it). But WMATA removed this conditional phraseology and inserted an imperative statement regarding what station managers must do. Thus, if SSOP 46.5.4.12 confers any discretion to station managers at all, it is merely the discretion to determine *which* areas of a station a confused customer (or one with diminished capacity) might sleep, and it is clear that any such discretionary determination is grounded in WMATA's mandatory walk-through directive, and *not* the particular manager's own "social, economic, or political" goals. *KiSKA*, 321 F.3d at 1159 (internal quotation marks and citation omitted).

*WMATA v. O'Neill*, 633 A.2d 834 (D.C. 1994), is instructive.  In *O'Neill*, the

D.C. Court of Appeals held that WMATA was not entitled to sovereign immunity for

injuries that resulted from a bus driver's failure to act, even where the relevant

regulations provided some discretion to the bus driver in responding to disruptive

passengers.  *See id.*, 633 A.2d at 839.  In that case, two unruly bus passengers were

harassing other passengers.  *See id.* at 836.  Two of the harassed individuals, including

O'Neill, informed the bus driver of the issue, who refused to take any action.  *See id.*

The bus driver again took no action after he observed one of the unruly passengers

make a death threat directed at O'Neill, and it was only after one of the unruly

passengers grabbed O'Neill that the bus driver activated the silent alarm.  *See id.*

The relevant WMATA policy in *O'Neill* mandated that the bus driver "instruct [a

disruptive passenger] to stop any offending conduct" and "ask him to leave the bus, but

[the driver] may not physically eject him unless there is immediate physical danger."

*Id.* at 837.  The policy also mandated that the bus driver activate the silent alarm if he

or she observes "threats of bodily harm."  *Id.* at 839.  Consequently, although there was

some discretion for bus drivers when responding to an emergency situation, the relevant

policy provided a minimum response, *see id.*, and did not confer on the bus driver

"unbridled discretion[,]" *id.* at 838.  Indeed, the D.C. Court of Appeals specifically

noted that "[t]he fact that in a particular case a [WMATA employee] might have an

alternative course of action from which to choose and this choice might involve a

certain degree of judgment, does not elevate the [WMATA employee's] decision to the

level of basic policy."  *Id.* at 839 (internal quotation marks and citation omitted).

So it is here.  Although the station-closing procedures permit station managers to determine, to some degree, where a disoriented or disabled passenger might sleep, the policy does not leave managers with "unbridled discretion" with respect to platform inspections such that WMATA can claim sovereign immunity if the prescribed inspection procedures are not followed and someone is injured.  *See id.* at 838.  And this is as it *should* be because, in relation to conduct that is not a quintessential government function or does not involve WMATA employees engaging in essentially sovereign acts, courts have consistently interpreted Section 80 to waive WMATA's sovereign immunity for torts that occur when its employees fail to follow a specific procedure or minimum standard, thereby treating WMATA just like other non-sovereign employers.  *See id* at 839.  In the instant context, this means that even if SSOP 46.5.4.12 empowers station managers to decide which areas of the platform a disoriented customer or a customer with diminished capacity might sleep, WMATA's standard procedures *require* station managers to make visual inspections and pay attention to such areas, and WMATA is not immune from suit when its employees are alleged to have breached this duty.  Put another way, it is clear to this Court that each manager's decision regarding which areas to inspect in furtherance of the mandatory inspection requirement is not a "judgment[] at the policy and planning level" that "should be immune from second-guessing by a jury."  *O'Neill* 633 A.2d at 839 (internal quotation marks and citation omitted).

The cases that WMATA cites are readily distinguishable from the instant circumstances.  In *Smith v. WMATA*, 290 F.3d 201 (4th Cir. 2002), the Fourth Circuit held that WMATA was immune from suit for its decision regarding how to respond to

an "emergency situation" when there was "no statutory or regulatory mandate specifically governing [WMATA's] actions in response to that situation." *Id.*, 290 F.3d at 209. Thus, when two of three escalators in the Bethesda Metro Station were inoperable, WMATA could not be sued for its decision to "brake" the third escalator and put it in "stair mode," even though a customer died of a heart attack climbing the escalator. *Id.* at 209. Unlike this case, the situation in *Smith* required WMATA to respond to an unforeseen circumstance in the absence of specific directives, and the circuit panel concluded that the employees "responded to the situation in a manner that implicated both their mission and public policy" such that the challenged act was best conceived of as having been performed in the course of WMATA's governmental function. *Id.* By contrast, here, Plaintiffs allege that WMATA was negligent by failing to carry out the agency's specified directives for routine platform inspections, not that its response to an emergency situation in the absence of specific directives was negligent.

*WMATA v. Barksdale-Showell*, 965 A.2d 16 (D.C. 2009), (*see* Def.'s Mot. at 13–14), likewise concerns WMATA's employees' responses to unpredictable circumstances in the absence of mandatory directives. In that case, inclement weather caused moisture to accumulate in a Metro station, and WMATA was held to be immune from a slip-and-fall lawsuit. *See id.*, 965 A.2d at 24. The D.C. Court of Appeals noted that "there was nothing in the [Severe Weather Plan] Alert or the relevant SSOPs that mandated certain actions to be taken[,]" and the most pertinent SSOP "contains an element of discretion" by only requiring certain actions to be taken "if possible." *Id.* at 22 (internal quotation marks omitted). Moreover, that discretion was grounded in

policy-making, because WMATA had to decide how to allocate its resources to deal with an ongoing weather-related emergency situation. *See id.* at 23. SSOP 46.5.4.12 differs substantially because it provides instructions for mandatory, routine inspections of a station, rather than prescribing flexible guidelines that permit WMATA employees to deal with novel situations. Furthermore, unlike the SSOP at issue in *Barksdale-Showell*, SSOP 46.5.4.12 does not permit station managers to deviate from the procedure if it is not feasible to follow it; instead, SSOP 46.5.4.12 makes crystal clear that the station manager *must* inspect the train platform in person, and that special attention *must* be paid to certain areas of the platform.

The other slip-and-fall case cited by WMATA, *Tinsley & Hodge v. WMATA*, 55 A.3d 663 (Md. 2012), is not to the contrary. This consolidated appeal dealt with two distinct slip-and-falls in WMATA stations: Tinsley alleged that WMATA's cleaning caused the floor to become slippery, *see id.*, 55 A.3d at 677, while Hodge alleged that WMATA had failed to clean up water that had accumulated because of snow being tracked into the station, *see id.* at 671. Whether WMATA was alleged to have created the unsafe situation or failed to allocate resources to address an unsafe condition, the Maryland Court of Appeals held that WMATA was immune from suit. *See id.* at 677. Notably, the court expressly reasoned that "challenges to the manner in which maintenance functions are carried out, but not in violation of any mandatory directive" are covered by WMATA's sovereign immunity, where "WMATA employees made determinations . . . based on economic and policy considerations." *Id.* at 676–77. By contrast, here, not only do Plaintiffs challenge conduct that does not involve WMATA's

maintenance functions, but Plaintiffs have also identified a mandatory directive that, as discussed below, a reasonable jury could find was violated.

For all these reasons, this Court concludes that the conduct of WMATA that allegedly resulted in the accident at issue does not implicate the agency's governmental function, and instead, WMATA's alleged failure to conduct a reasonable investigation of the train platform under the circumstances presented in this case fits within the agency's proprietary functions. Thus, Section 80 has waived WMATA's sovereign immunity in this regard, and WMATA is not immune from this lawsuit.

**B.     Disputed Material Facts Regarding WMATA's Alleged Negligence Exist And Preclude Entry Of Summary Judgment In WMATA's Favor**

Pursuant to Federal Rule of Civil Procedure 56, WMATA contends that Plaintiffs have failed to adduce admissible evidence that could support a reasonable jury finding that Plaintiffs have proved all of the essential elements of their negligence claim. (*See* Def.'s Mot. at 18–23.) A plaintiff asserting negligence under the law of the District of Columbia must show (1) a duty of care owed by the defendant to the plaintiff, (2) a breach of that duty of care, and (3) damage to the plaintiff caused by that breach. *See Girdler v. United States*, 923 F. Supp. 2d 168, 187 (D.D.C. 2013) (citation omitted). In the instant summary judgment motion, WMATA argues that Plaintiffs have neither raised a genuine dispute of material fact regarding the applicable standard of care, nor proffered sufficient evidence to establish WMATA's breach of any duty it owed to Whiteru. (*See* Def.'s Mot. at 18–23.)

With respect to the applicable standard of care, WMATA argues, first, that Plaintiffs cannot rely solely on WMATA's internal operating procedures to establish the relevant standard of care (*see id.* at 21–23; *see also id.* at 22 (arguing that "'[c]ompany

rules are not 'conclusive' or 'wholly definitive' of the standard of care" issue, and further noting that courts have held that WMATA manuals alone are insufficient to establish the standard of care (citation omitted))), and second, that Plaintiffs lack the "necessary expert testimony" to establish the standard of care (*see id.* at 22 (arguing that expert testimony is required to establish that the manuals "embod[y] a national standard of care and not a higher, more demanding one" (alteration in original) (internal quotation marks omitted) (quoting *Clark v. D.C.*, 708 A.2d 632, 636 (D.C. 1997))); *see also id.* at 23 (contending that Plaintiffs' expert witness did not rely upon any national standards or guidelines that apply "to mass transit rail station maintenance")). The fact that Plaintiffs have proffered evidence that relates to the standard of care beyond the mere language of the SSOP belies Defendant's contention that Plaintiffs have attempted to demonstrate the standard of care through "SSOP 46 alone[,]" (Def.'s Mot. at 23), and in addition, WMATA's challenge to the sufficiency of Plaintiffs' proffered expert must fail at this juncture because WMATA has not demonstrated—as a threshold matter— that Plaintiffs are required to adduce expert testimony to establish the pertinent standard of care under these circumstances.

It is well established that "company rules are not 'conclusive' or 'wholly definitive'" of the standard of care, *WMATA v. Young*, 731 A.2d 389, 398 (D.C. 1999); however, such policies are "admissible as *bearing on the* standard of care[.]" *Briggs v. WMATA*, 481 F.3d 839, 848 (D.C. Cir. 2007) (emphasis in original) (quoting *Clark v. D.C.*, 708 A.2d 632, 636 (D.C. 1997)); *see also Garrison v. D.C. Transit System, Inc.,* 196 A.2d 924, 925 (D.C.1964) ("[R]egulations of a defendant for guidance of its employees in the performance of their duties are admissible and may be considered on

the issue of whether due care was exercised by the employee under the particular circumstances of the case.").  "In a typical negligence case, the standard of care applicable to a person's conduct is simply that of a reasonable man under like circumstances[,]" and a jury can ordinarily "ascertain this standard without the aid of expert testimony." *Godfrey v. Iverson*, 559 F.3d 569, 572 (D.C. Cir. 2009) (internal quotation marks and citation omitted).  However, "if the subject in question is so distinctly related to some science, profession or occupation as to be beyond the ken of the average layperson," D.C. law requires expert testimony to establish the pertinent standard of care, "unless the subject matter is within the realm of common knowledge and everyday experience." *District of Columbia v. Arnold & Porter*, 756 A.2d 427, 433 (D.C. 2000) (internal quotation marks and citations omitted).  When expert testimony is required, the expert may not simply "declare that the [defendant] violated the national standard of care[,]" but must instead "clearly articulate *and reference* a standard of care" and "relate the standard of care to the practices generally followed by other comparable facilities[.]" *Briggs v. WMATA*, 481 F.3d 839, 846 (D.C. Cir. 2007) (emphasis and first alteration in original) (quoting *Clark v. D.C.*, 708 A.2d 632, 635 (D.C. 1997)).

In the instant case, Plaintiffs have designated an expert witness, Michael Hodge, to testify to the standard of care, and in so doing, have presented evidence that extends beyond WMATA's SSOPs.  In his expert report and deposition, Hodge relies on his personal inspection of the Judiciary Square Metro Station, as well as Hodge's experience and training, which includes work in the security organization of the United States Marine Corps and 20 years with the Secret Service (*see* Hodge Dep., Ex. 6 to

Pls.' Opp'n, ECF No. 28-6, at 2–8), and while working with the Secret Service in particular, Hodge "provid[ed] protection for the general public as well as special dignitaries, which included areas such as what WMATA runs, . . . inspection of all kind of facilities, observing and reporting those risks of harm which are reasonable and can be identified" (*id.* at 2). (*See also* Hodge Forensic Report, Ex. 6(b) to Pls.' Opp'n, ECF No. 28-6 at 11 (describing how Hodge has "conducted over 100 surveys of premises and established security plans, including public transportation environments").) As relevant here, Hodge's testimony points to SSOP 46.5.4.12 as evidence of the standard of care WMATA requires of its station managers, but his expert opinion also includes the conclusion that a "reasonable inspection" of the Judiciary Square Metro Station would have included looking over the parapet. (Hodge Dep. at 6.) Through Hodge, Plaintiffs have proffered evidence to establish a standard of care applicable to the conduct Plaintiffs claim was negligent, and as a result, the Court rejects WMATA's suggestion that Plaintiffs impermissibly rely on "SSOP 46 alone" to establish this standard. (Def.'s Mot. at 23.)

Notably, the Court also rejects WMATA's challenge to the adequacy of Hodge's testimony in conveying a national standard of care, because, as a threshold matter, it is far from clear under District of Columbia law that Plaintiffs were *required* to present expert testimony for the specific purpose of articulating a national standard of care. *See Godfrey*, 559 F.3d at 572 ("We do not believe these cases stand for the proposition that expert testimony is always required to establish the standard of care[.]"). D.C. law requires expert testimony only "if the subject in question is so distinctly related to some science, profession or occupation as to be beyond the ken of the average layperson[,]"

*id.* (internal quotation marks and citation omitted), and only where such testimony is required must the expert clearly articulate and reference a national standard of care, *see Briggs*, 481 F.3d at 846.

By focusing its challenge on the sufficiency of Hodge's testimony vis-à-vis the national-standard-of-care requirement, WMATA has assumed that an expert is necessary to establish a national standard of care in this case, and has failed to specifically address this significant threshold issue. Controlling case law makes clear that whether an expert is needed in order to establish a national standard of care is a fact-driven inquiry, which renders any such assumption unwarranted. *See Godfrey*, 559 F.3d at 573 ("As to the need for expert testimony, the factual context mattered in those cases and it matters in this one too."). *Compare Messina v. D.C.*, 663 A.2d 535, 538 (D.C. 1995) (finding that expert testimony was necessary to establish the standard of care for installation of cushioning under the monkey bars on a playground), *and Rajabi v. Potomac Elec. Power Co.*, 650 A.2d 1319, 1322 (D.C. 1994) (holding that "[w]hether a particular maintenance schedule for street lights . . . is sufficient to protect passers-by from the hazard of falling light globes is not within the knowledge of the average lay person"), *with District of Columbia v. Shannon*, 696 A.2d 1359, 1365–66 (D.C. 1997) (concluding no expert testimony was necessary to establish whether holes in the side rails of a playground slide created an unreasonably dangerous condition), *and O'Neill*, 633 A.2d at 841 ("[I]t is not beyond the ken of an average juror" to "decide whether the [bus] driver followed ordinary care in the circumstances in responding to disruptive conduct.").

This all means that the mere fact that Plaintiffs have *proffered* an expert in this case does not necessarily establish that they were *required* to offer this evidence for the particular purpose WMATA suggests. And in the absence of a developed argument from WMATA regarding the necessity of expert testimony to establish the standard of care under these circumstances, this Court is unwilling, at this juncture, to hold that WMATA is entitled to judgment as a matter of law based on any perceived insufficiency regarding Hodge's testimony.[10]

With respect to WMATA's alternative contention that there is no genuine dispute of fact regarding breach, WMATA asserts that its employees had no reason to know Whiteru was injured, since Whiteru was not injured after his initial fall down the escalator, which occurred after his communication with station manager Brown. (*See* Def.'s Mot. at 19.) But this contention distorts Plaintiffs' theory of liability in light of the record evidence developed during discovery. The critical issue of fact, as Plaintiffs have presented it, is whether Rhonda Brown performed inspections of the train platform on the date in question, and if so, whether she performed those inspections reasonably. (*See* Pls.' Opp'n at 6–9.) Plaintiffs' theory does not rely on Brown's *knowledge* of Whiteru's injury; indeed, quite to the contrary, Plaintiffs acknowledge that Brown did

---

[10] The parties will be given another opportunity to address this issue—which may be a significant one—prior to trial, in the context of a motion in limine. Any such a motion must address *both* the necessity of expert testimony under these circumstances, and the sufficiency of the testimony that Hodge has provided. Given the state of the law in the District of Columbia, the result of this motion may very well dispose of this case short of trial. *See, e.g.*, *Briggs*, 481 F.3d at 848 (affirming summary judgment in the defendant's favor where the plaintiff's expert's deposition testimony was insufficient to establish the national standard of care).

not know about Whiteru's condition, but maintain that she *would have* discovered him but for her failure to perform adequate inspections. (*See id.* at 6.)[11]

Notably, Brown's deposition testimony—which attempts to address, among other things, Brown's typical practices as a station manager—is contradictory at times and is far from a model of clarity, which, unfortunately for the agency, makes her statements ultimately raise more disputed factual issues than they resolve. For example, immediately after stating that she could not recall ever looking over the parapet during an inspection, Brown states that she "look[s] occasionally for things that people have lost" behind the parapet—a statement that she later undermines by remarking that she "[t]ypically" does not check behind the parapet. (Brown Dep., Ex. 5 to Pls.' Opp'n, ECF No. 28-5, at 16, 21.) Similarly, Brown initially admits that she has used the closed-circuit monitors to perform a visual inspection "in lieu of walking" the platform from end to end. (*Id.* at 8.) But in a subsequent deposition, Brown first denies that "sometimes" the closed-circuit monitors are used for inspections instead of walking the platform (*id.* at 6), then admits that she would use the monitors alone if she was in "a predicament" (*id.*). Brown also testifies that she "do[es] use the TVs." (*Id.*)

Brown's conflicting statements regarding how she ordinarily carries out her inspection duties renders WMATA's reliance on her testimony to argue there is no genuine dispute as to any material fact related to the fulfillment of her duties on the

---

[11] Brown's alleged breach of the duty to inspect and thereby discover Whiteru is the linchpin of Plaintiffs' negligence claim—and the key disputed fact—because there is no dispute that, had Brown performed a reasonable inspection (however defined) and discovered Whiteru in his incapacitated state, she would have had a duty to render some form of assistance. *See* Restatement (Second) of Torts § 314A(1)(b) (1965) ("A common carrier is under a duty to its passengers to take reasonable action . . . to give them first aid after it knows or has reason to know that they are ill or injured[.]"); *id.* cmt. d ("The duty to give aid to one who is ill or injured extends to cases where the illness or injury is due to . . . the negligence of the plaintiff himself, as where a passenger has injured himself by clumsily bumping his head against a door.").

date in question here entirely unpersuasive. On the basis of Brown's testimony, a reasonable jury could conclude that she failed to fulfill the requirement that she make three in-person inspections of the platform after Whiteru fell behind the parapet, and this is especially so because Brown has testified that she has no independent memory of making those particular inspections (even though she filled out an employee log indicating that she completed them [*see* Station Manager Hourly Checklist, Ex. to Def.'s Mot., ECF No. 27-3, at 2]), and because Brown has admitted that she has used the closed-circuit monitors for platform inspections in the past. The jury could also reasonably find that, even if Brown walked the platform from end to end on October 19, 2013, Brown failed to perform a reasonable inspection when she did not look over the parapet. (*See* Brown Dep. at 16 (stating that she cannot recall ever having looked over the parapet during an inspection).) The record amply demonstrates that anyone who looked over the parapet would have seen Whiteru (*see* Surveillance Photos, Ex. 1 to Pls.' Opp'n, ECF No. 28-1, at 8–9; Brown Dep. at 19), and that if help had been summoned based on that observation, Whiteru would have survived (*see* William Manion Report, Ex. 2(a) to Pls.' Opp'n, ECF No. 28-2, at 4; R.F. Davis Report, Ex. 2(b) to Pls.' Opp'n, ECF No. 28-2, at 7). Consequently, Plaintiffs have proffered sufficient record evidence regarding whether or not Brown fulfilled her inspection duties on the date in question to thwart Defendant's summary judgment argument.

## IV.   CONCLUSION

For the foregoing reasons, WMATA does not enjoy sovereign immunity given the conduct at issue, which means this Court does have jurisdiction over this matter, and Plaintiffs have demonstrated that a genuine dispute of material fact exists as to each

element of their negligence contention.  Therefore, WMATA's motion for summary

judgment will be **DENIED**.  A separate Order accompanies this Memorandum Opinion.


DATE:  July 7, 2017                    *Ketanji Brown Jackson*
                                       KETANJI BROWN JACKSON
                                       United States District Judge